## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | |
|---|---|
| FRONTIER AMBULANCE SOLUTIONS, LLC, | ) )  ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action File No. _____ ) |
| DEE BENSON DIGET, ANTONIO SANCHEZ, JANE/JOHN DOES 1-5, and DOE CORPORATIONS 1-5, | ) ) ) ) |
| Defendants. | ) ) |

## PLAINTIFF'S VERIFIED COMPLAINT
## FOR INJUNCTIVE RELIEF, DAMAGES, AND ATTORNEYS' FEES

Plaintiff Frontier Ambulance Solutions, LLC ("FAS" or "Plaintiff") files this Verified Complaint for Injunctive Relief, Damages, and Attorneys' Fees against Dee Benson Diget ("Diget"), Antonio Sanchez ("Sanchez"), Jane/John Does 1-5, and Doe Corporations 1-5 (collectively "Defendants"). Plaintiff respectfully requests that this Court: (1) enter a preliminary injunction, and a permanent injunction to prohibit Defendants from falsely depicting the origin of FAS's ambulances and improperly using FAS's imagery in advertisements for a competing company, tortuously soliciting FAS's employees, interfering with its contractual relations, and interfering with its prospective business relations; and (2) award FAS all damages

to which it is entitled included actual, compensatory, and punitive damages, as well as costs and attorneys' fees.

## PARTIES, JURISDICTION, AND VENUE

1.      This is an action for false advertising under the Lanham Act of 1946, as amended, 15 U.S.C. § 1051 *et seq.* ("Lanham Act"), and the laws of the State of Georgia.

2.      This Court has jurisdiction over this action under Section 39 of the Lanham Act, 15 U.S.C. § 1121, and Title 28 of the United States Code, §§ 1331 and 1338, and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a).

3.      FAS is a Georgia limited liability company with its principal office at 1106 Warm Springs Highway, Manchester, Meriwether County, Georgia 31816. FAS is registered to do business in the State of Georgia.

4.      Diget resides in Meriwether County, at 1249 Dolly Harris Road, Senoia, Georgia 30276. Diget is subject to this Court's jurisdiction.

5.      Sanchez resides in Spalding County, at 337 Wynterhall Drive, Griffin, Georgia 30224. Sanchez is subject to this Court's jurisdiction.

6.      Plaintiff intends to name as Defendants other persons who, either directly or by joining with others, or who were agents (actual or apparent) or an alter

ego of other Defendants and were responsible for the actions and inactions that caused the injuries described herein. Defendants Jane/John Does 1-5 are unknown or unidentified persons within the network of individuals who participated in these acts and omissions. Plaintiff cannot determine the exact number or identities of such individuals at this time.

7.     Plaintiff intends to name as Defendants any other entities that are, or were, an alter ego of the Defendants named in this action, or who were agents (actual or apparent) of or joint-venturers with the named Defendants. Defendants Doe Corporations 1-5 are unknown or unidentified entities within the network of individuals and businesses who participated in the acts and omissions described herein. Plaintiff cannot determine the exact number or identities of such entities at this time.

8.     The Court has personal jurisdiction over all parties to this action.

9.     Venue is proper under 28 U.S.C. § 1391 in that Defendants reside and may be found in this district and in that a substantial part of the events giving rise to the claim occurred here.

## FACTUAL BACKGROUND

***Diget's Dealings Prior to FAS.***

10.    Plaintiff restates and incorporates by reference the paragraphs asserted above.

11.    Diget originally worked at Peach State Ambulances, Inc. ("Peach State"), wherein she worked as Peach State's registered agent.

12.    Diget subsequently formed Foundation Ambulance, Inc. and caused it to acquire the assets, including equipment, materials, and sales, of Peach State after that company filed for bankruptcy on or about 2016. *See In re Peach State Ambulance, Inc.*, Case no. 16-12121-WHD (U.S.B.C. N.D. Ga.), Dkt. 78 and 100.

13.    According to the records of the Georgia Secretary of State, Diget formed Foundation Ambulance, Inc. ("Foundation") on or about October 6, 2016.

14.    On February 17, 2017, the Trustee moved to obtain authority from the bankruptcy court to sell the assets identified in the motion to Foundation Ambulance, Inc. [Dkt. 78] The bankruptcy court granted the Trustee's motion on March 23, 2017 [Dkt. 100], and the assets of Peach State were sold to Foundation for a sum not less than $29,430.00.

15.     Diget served as the Chief Executive Officer, Chief Financial Officer, Secretary, and Registered Agent of Foundation.

16.     Diget was able to fund the incorporation and operation of Foundation due in large part to investments from her sister in law, Diana May-Diget Dubbeld ("Dubbeld"). Specifically, Dubbeld paid Diget and Foundation $500,000 in June 2017 to obtain a 33 1/3% ownership interest in Foundation.

17.     As the majority shareholder, CEO, CFO, Secretary, and sole board member of Foundation, Dubbeld asserted that as the minority shareholder, Diget owed her a fiduciary duty.

18.      In an adversary proceeding in the Foundation bankruptcy, Dubbeld claimed that Diget would frequently threaten Dubbeld that her $500,000 equity contribution in Foundation, and any chance of repayment of the amounts she had loaned to Foundation, would be lost if Dubbeld did not provide more money to keep Foundation afloat.

19.     Dubbeld claimed that when she attempted to obtain information regarding Foundation's financial affairs from Diget, these requests were met with hostility.

20.     Dubbeld alleged that Diget represented to her that Foundation had "cash flow problems," but the financial health of the business was fundamentally sound and business was good.

21.     Diget, on behalf of Foundation, induced First Landmark Bank (the "Bank") to loan $568,000 on or about July 2018.

22.     Dubbeld further alleged that Diget consistently misrepresented the value of Foundation's accounts receivables, inventory and equipment in financial reports to the Bank and Dubbeld and that the true value of the accounts receivables, equipment and inventory was well below the value that Diget represented.

23.     Diget continuously misrepresented to the Bank and Dubbeld that Foundation's equipment and machinery was valued at $513,108, yet later bankruptcy filings showed that Foundation's equipment and machinery was actually worth $25,000.

24.     It was later revealed by the bankruptcy that Foundation was financially unsound, and Diget caused Foundation to file a voluntary petition for Chapter 7 Bankruptcy in the Northern District of Georgia on January 23, 2020.

**FAS's Formation in 2020.**

25.     On or about February 2020, Al-Hassan Aliyu ("Aliyu") formed FAS.

6

26.   In or about June 2020, Sandra Garrard ("Garrard") purchased Foundation's assets and assumed its debts from the Chapter 7 bankruptcy trustee. Subsequently, on or about June 18, 2020, FAS purchased Foundation's assets and assumed its debts from Garrard for the purchase price of twenty-two thousand five hundred dollars ($22,500).

27.   FAS and Aliyu used Foundation's acquired assets to operate and build FAS.

28.   FAS manufactures and assembles ambulances and other non-emergency medical vehicles for public and private customers across the United States.

29.   Specifically, FAS converts specific vehicles, such as a Ford Transit Vans, and fully builds out and customizes the vans to become ambulance or other non-emergency medical vehicles. The conversion process includes building out and installing specialized cabinetry, advanced carpentry, and outfitting the vehicle with internal and external electrical functions so the vehicle can serve as a fully functional and certified ambulance capable of providing medical services to patients.

30.   The ambulance manufacturing and assembly industry is highly specialized and requires a great deal of skill and knowledge of vehicles, medical

equipment, and regulations regarding the certification of ambulances in order to build functional and certified ambulances for its clients.

31.     There are only a handful of companies in the United States like FAS that manufacture and assemble ambulances and other non-emergency medical vehicles, making this a highly competitive industry.

32.     When FAS acquired the assets of Foundation, Aliyu sought to employ as many of Foundation's employees as possible. These employees not only had highly specialized skills, but he did not want Foundation's employees to lose their jobs when he acquired Foundation's assets.

33.     Diget served as FAS's Vice President, and her employment began on or about July 20, 2020.

34.     Diget formerly formed, owned, and operated Foundation. Accordingly, when FAS acquired Foundation's assets, Aliyu was confident in Diget's industry knowledge and operational experience and afforded her with a large amount of responsibility and autonomy.

35.     Diget was the highest-ranking employee of FAS who was present onsite daily.

36.   Diget was in charge of FAS's finances and day-to-day operations, including overseeing the ambulance manufacture and assembly, ensuring the vehicles were being completed and fulfilled pursuant to their contracts, managing employees, assisting clients, and general autonomous financial authority to make sales and manage FAS's finances.

37.   Sanchez served as FAS's Production Manager, and his employment began on or about August 17, 2020.

38.   Sanchez was the second-highest ranking employee of FAS onsite daily.

39.   Sanchez assisted Diget with FAS's day-to-day operations, including overseeing ambulance manufacture and assembly, ensuring the vehicles were being completed and fulfilled pursuant to their contracts, and managing employees.

### FAS's Business Dealings with Customer X[1] and Diget and Sanchez's Formation of a Competing Company.

40.   In March 2022, FAS began communications with a potential customer, Customer X, which was seeking to acquire a substantial number of ambulance vehicles.

---

[1] FAS is using a pseudonyms to protect the identity and privacy of its customer and its employees.

41.     Customer X is a corporation that uses AI-powered technology, mobile medical clinicians to provide remote medical care.

42.     On or about March 2021, Customer X merged with Corporation Y, and Customer X subsequently became a publicly traded company.

43.     Upon information and belief, due to Customer X's merger with Corporation Y, Customer X received an influx of investments to rapidly grow Customer X's fleet of vehicles and expand across the United States.

44.     On or about March 8, 2022, Customer X submitted a purchase order for FAS to create 18 non-emergency medical vehicles for its operations, which FAS completed in or about April 2022.

45.     In November and December 2022, Customer X, placed three deposits totaling $306,488.16 for FAS to build another 22 non-emergency medical vehicles so Customer X could continue to expand its mobile medical care to patients across the United States.

46.     Specifically, Customer X, through its Fleet Manager, Employee Z, paid a deposit for FAS to manufacture and assemble 16 vehicles and remount and refurbish 6 vehicles on behalf of Customer X.

47.     Customer X ordered 22 total vehicles from FAS, and FAS accepted Customer X's order for those vehicles.

48.     Following this initial order, Customer X promised to order, at a later date, an additional 16 vehicles to continue expanding its operations across the United States.

49.     Following the COVID-19 pandemic, a central component to these vehicles, chassis, were in short supply. Customer X had a connection with a chassis supplier, Sean Connolly ("Connolly"), the National Account Manager for Creative Bus Sales, Inc. ("Creative Bus"). Connolly and Creative Bus were willing and able to provide the chassis to FAS for its use in fulfilling the order it received from Customer X. As such, FAS and Customer X agreed that Customer X would supply its own chassis (through Connolly and Creative Bus) for the vehicles that FAS would then manufacture and assemble.

50.     A representative of Customer X introduced Diget to Connolly, and Diget and Connolly developed a professional relationship.

51.     On or about November 2022, Customer X began making inquiries about whether Aliyu would be willing to sell FAS and, ultimately, offered to purchase FAS, but Aliyu declined.

11

52.     On or about December 2022, Connolly offered to purchase FAS, but Aliyu declined.

53.     Approximately two weeks after Aliyu declined Connolly's offer to purchase FAS, Diget asked Aliyu if Creative Buses (Connolly's company) "gave her an offer" to work for it, would Aliyu "match [Creative Buses'] offer."

54.     Upon information and belief, after Aliyu declined to sell FAS to Connolly, Connolly formed a new ambulance manufacturing and assembly company, Star Ambulance Systems, LLC in Sarasota, Florida ("Star Ambulance Florida") on or about March 10, 2023.

55.     Thereafter, on April 25, 2023, Diget organized and formed a new Georgia company with an identical name to Connolly's newly formed Florida company, Star Ambulance Systems, LLC ("Star Ambulance Georgia"). According to the Certificate of Organization filed with the Georgia Secretary of State, Diget formed Star Ambulance Georgia on April 25, 2023, designated herself as the organizer, and listed her home address, 1249 Dolly Harris Road, Senoia, Georgia 30276 as Star Ambulance Georgia's principal office address.

56.     Upon information and belief, Diget and Sanchez purchased a building in Woodland, Georgia and began operating a business in competition with FAS while both were still employed by FAS.

57.     Upon information and belief, Diget and Sanchez took steps well beyond preparing to compete with FAS and, in fact, operated the business of Star Ambulance Georgia while they both were still employed by FAS.

58.     Upon information and belief, Star Ambulance Georgia or another unknown person or entity began compensating Diget and Sanchez for their competitive work even though they were still employed by FAS.

59.     On or about March 2023, Customer X attempted to cancel its order that it placed for non-emergency medical vehicles with FAS. Specifically, Employee Z demanded that FAS and Aliyu return the deposit to Customer X.

60.     A representative of Customer X told Aliyu that Customer X was going to move its business from FAS to Connolly's ambulance manufacturing and assembly company, which is believed to be either Star Ambulance Florida or Star Ambulance Georgia.

61.     The relationship between Star Ambulance Florida and Star Ambulance Georgia is presently unknown.

13

62.   At the time of Customer X's request, FAS was unable to return Customer X's deposit because FAS had already used the funds to purchase equipment and materials to manufacture and assemble the non-emergency medical vehicles that Customer X had ordered. FAS was waiting on Customer X (via Connolly) to deliver the chassis when Customer X requested that its deposit be returned.

63.   Diget, while working as Vice President for FAS and, upon information and belief, also operating a business competitive to FAS, began to "mediate" between Customer X, on the one hand, and Aliyu and FAS, on the other, for a solution over Customer X's demand to cancel its order. In fact, Diget proposed that FAS construct only four vehicles for Customer X, which was substantially less than the 22 vehicles Customer X initially intended to order from FAS.

64.   At the same time that she was attempting to mediate the dispute between FAS and Customer X, Diget simultaneously was pressuring Aliyu to return the $306,488.16 deposit to Customer X. Diget claimed to Aliyu that he was making a mistake by failing to return the money and that he would suffer financial consequences for failing to accept Diget's efforts to "mediate" the dispute.

65.    During the negotiations between FAS and Customer X, Diget also offered to take Customer X's business to her company with Sanchez, Star Ambulance Georgia, to complete the builds at the new facility. As a part of this offer, Diget stated that she would pay Aliyu a set fee for each vehicle that she and Sanchez completed.

***Diget and Sanchez's Tortious Actions While Still Employed by FAS.***

66.    On or about February and March 2023, Diget and Sanchez, while serving as FAS's Vice President and Production Manager, respectively, began threatening FAS's employees and attempting to steal FAS's proprietary information.

67.    On or about February or March 2023, Diget met with Scott Gilbert ("Gilbert"), FAS's Sales Manager. Diget told Gilbert that FAS was "not going to last" and Gilbert was going to lose his job.

68.    During this meeting, Diget told Gilbert that she had a competing business with Sanchez and was in the process of designing and outfitting a building in Manchester so Diget and Sanchez could begin manufacturing and assembling ambulances.

69.     Diget made designs and drawings to help assist her organize the new building for Star Ambulance Georgia on her FAS company computer while she was serving as FAS's Vice President.

70.     During this meeting, Diget told Gilbert that he needed to join her new company with Sanchez or Gilbert would become unemployed.

71.     Approximately one week after Diget's meeting with Gilbert, Diget called Gilbert into a meeting she was having with Aliyu. During this meeting, Diget attempted to get Gilbert to quit his job in front of Aliyu and join her competing venture.

72.     Diget attempted to scare and threaten Gilbert so that he would join Diget and Sanchez at their competing venture.

73.     On or about March 2023, Diget told Jason Newman ("Newman"), a FAS Electrician, that FAS's "last truck" was coming up, thereby suggesting that FAS was going out of business.

74.     During this conversation, Diget solicited Newman to join her at her competing venture.

75.     Diget was attempting to scare and threaten Newman so that he would leave FAS and join Diget and Sanchez at their competing venture.

16

76.   On or about March 2023, Sanchez then told Newman that if he chose to "stay" at FAS, Newman would "lose" all of his vacation days. However, if Newman joined Sanchez and Diget at their competing venture, Newman would get to "keep" his vacation days.

77.   Sanchez was attempting to scare and threaten Newman so that he would join Sanchez and Diget at their competing venture.

78.   On or about March 17-18, 2023, Diget texted Tracey Kocher ("Kocher"), FAS's Lead Cabinet Maker, that FAS "is down to the last few trucks." Diget further indicated that Kocher would be one of the first employees to lose his job when FAS went out of business.

79.   Diget was attempting to scare and threaten Kocher so that he would leave FAS and join Diget and Sanchez at their competing venture.

80.   Indeed, Diget encouraged Aliyu to lay off the cabinet team first if this ever became necessary. Upon information and belief, Diget encouraged Aliyu to terminate Kocher's employment so Diget could hire him as a Lead Cabinet Maker at Star Ambulance Georgia.

81.     During the week of March 27, 2023, Diget visited FAS's shop and told Brendon Thorne ("Thorne"), another FAS Electrician, that it "wouldn't be long" before FAS went out of business.

82.     During this conversation, Diget told Thorne that she was starting a competing business with Sanchez and they had secured a 40,000-square-foot facility to compete with FAS. Diget told Thorne that if she joined the competing business, she would "guarantee" Thorne a job with "more pay" than he was currently receiving at FAS. Due to her high level position with FAS, Diget knew exactly what Thorne was being paid by FAS.

83.     Diget was attempting to scare and threaten Thorne so that he would leave FAS and join Diget and Sanchez at their competing venture.

84.     Sanchez also attempted to steal FAS's proprietary cabinet patterns for use at the competing venture he was working at with Diget.

85.     Specifically, when FAS outfits ambulances, it uses proprietary pre-designed cabinet patterns so the Cabinet Makers do not have to recreate each set of cabinets from scratch. The cabinet patterns were originally designed by Kocher.

86.     On or about February or March 2023, Sanchez asked Joe Ivey ("Ivey"), FAS's Cabinet Maker, to make duplicates of the patterns for the cabinetry FAS

installs in the ambulances. Sanchez's request was highly unusual, as FAS only has (and needs) one set of cabinet patterns. Indeed, FAS has used the same set of cabinet patterns to outfit numerous ambulances since its inception.

87.    Sanchez further instructed Ivey that he should put the completed cabinet patterns into a closet so they would be hidden from view.

88.    Kocher and Newman subsequently discovered the new cabinet patterns in a closet on or about March 2023.

89.    Due to the behavior described above, Aliyu prohibited Sanchez and Diget from returning to FAS's property.

90.    Sanchez voluntarily resigned from his employment with FAS on or about March 23, 2023.

91.    Aliyu terminated Diget's employment on or about May 7, 2023.

***Diget and Sanchez's Tortious Actions Following Their Employment at FAS.***

92.    To date, Diget and Sanchez continue to solicit FAS's employees and spread falsehoods about the state of FAS's business. By way of example, as recently as the week of July 17, 2023, Diget repeatedly texted FAS's employees incorrectly stating that Aliyu sold FAS. Diget continues to actively imply that the employees will lose their jobs and they should join Diget and Sanchez at a competing venture.

93.     Diget and Sanchez created a website to advertise their new company, Star Ambulance Georgia, at the following website: starambulancesys.com.

94.     Star Ambulance Georgia prominently provides Diget's contact information, including her email address at dee@starambulancesys.com and her personal phone number at 678-233-7187.

95.     Diget and Sanchez have used photographs of certain vehicles manufactured and assembled by FAS to advertise on behalf of Star Ambulance Georgia. Specifically, some of these vehicles display FAS's emblem on said vehicles, including the following:



96.     Diget and Sanchez have also used an edited version of the photograph in Paragraph 24 to advertise on behalf of Star Ambulance Georgia.

97.     As recently as October 10, 2023, Diget and Sanchez have used this photograph on its Facebook page to advertise Star Ambulance Georgia, as depicted below:



98.     Additionally, Diget and Sanchez have used photographs of FAS's vehicles to market or advertise Star Ambulance Georgia, and these photographs were taken on FAS company property or the surrounding parking lot area, and included

FAS's principal place of business and FAS's signage appears in the background, including the following:



99.    Diget used FAS's account credentials to change FAS's Facebook page to the account name and brand of her competing business, Star Ambulance Georgia.

Indeed, Diget prominently posted a new email she created as the contact email for Star Ambulance Georgia on the Facebook page:  dee@starambulancesys.com.

### COUNT ONE: FALSE DESIGNATION OF ORIGIN
### Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)
### (*Against Diget and Sanchez*)

100.   Plaintiff restates and incorporates by reference the paragraphs asserted above.

101.   The acts of Diget and Sanchez complained of herein constitute false designation of origin in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

102.   In connection with their competing business, Star Ambulance Georgia, Diget and Sanchez have misrepresented and continue to misrepresent FAS's goods (its ambulances) and services (building out and customizing ambulances) as their own.

103.   The ambulances and vehicles depicted in the photographs on Star Ambulance Georgia's website were created by and originated with FAS.

104.   Diget and Sanchez have taken FAS's goods, services, and products, and represented it to be the work of Star Ambulance Georgia, including the use of

photographs containing FAS's emblem, signage, and depicting FAS's principal place of business.

105.   Diget and Sanchez have falsely designated the origin of the vehicles in the photographs of those as Start Ambulance Georgia, when in fact they were designed and created by FAS.

106.   Diget and Sanchez's false and misleading use of FAS's vehicle photographs is likely to cause confusion, mistake, or deceive customers and potential customers.

107.   Diget and Sanchez's false designation of the origin of Star Ambulance Georgia's goods and services on its website has caused, and is likely to further cause, competitive or commercial injury to FAS.

108.   Unless these unfair and deceptive practices and acts of unfair competition by Diget and Sanchez are restrained by this Court, they will continue to cause irreparable injury to FAS and to the public, for which there is no adequate remedy at law.

109.   Diget and Sanchez's activities complained of herein have been malicious, fraudulent, deliberate, willful, intentional, and in bad faith, with full knowledge and conscious disregard of FAS's rights.

110.   In view of the egregious nature of Diget and Sanchez's actions, this is an exceptional case within the meaning of Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), entitling Plaintiff to its damages, Diget and Sanchez's profits, and the costs of the action, including attorney's fees.

### COUNT TWO: FALSE ADVERTISING
### Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)
### (*Against Diget and Sanchez*)

111.   Plaintiff restates and incorporates by reference the paragraphs asserted above.

112.   The acts of Diget and Sanchez complained of herein constitute false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

113.   In connection with their competing business, Star Ambulance Georgia, Diget and Sanchez have made false and misleading statements in commerce via promotional and advertising, including on Star Ambulance Georgia's website.  Star Ambulance Georgia's website contains literally false statements and misleading representations regarding the vehicles it claims it can create for customers, the expected quality of the vehicles, the design and internal layout of the vehicles, the

expected cabinetry and hardware, and the overall deliverable that would be delivered to the customers.

114.   The photographs used on Star Ambulance Georgia's website were false or misleading because they depicted FAS's certified vehicles with FAS's emblems with FAS's signage in the background.

115.   Diget and Sanchez have engaged in a deliberate course of conduct to deceive consumers into believing that they would receive vehicles built by FAS, including vehicles containing FAS's emblem.

116.   Diget and Sanchez's false and misleading statements are likely to cause confusion or mistake or to deceive customers and potential customers.

117.   Diget and Sanchez's false and misleading statements will have the effect of causing the consumers to transact business with them and Star Ambulance Georgia rather than with FAS under the mistaken belief that Star Ambulance Georgia can or will create FAS's quality vehicles containing FAS's emblems.

118.   Diget and Sanchez's false and misleading statements will have the effect of causing the consumers to transact business with them and Star Ambulance Georgia rather than with FAS under the mistaken belief that Star Ambulance Georgia is somehow affiliated or associated with FAS due to the widespread use of

photographs of FAS's vehicles, emblems, signage, and photographs depicting FAS's principal place of business.

119.   Unless these unfair and deceptive practices and acts of unfair competition by Diget and Sanchez are stopped and restrained by this Court, they will continue to cause irreparable injury to FAS and to the public, for which there is no adequate remedy at law.

120.   Diget and Sanchez's activities complained of herein have been malicious, fraudulent, deliberate, willful, intentional, and in bad faith, with full knowledge and conscious disregard of FAS's rights.

121.   In view of the egregious nature of Diget and Sanchez's actions, this is an exceptional case within the meaning of Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), entitling Plaintiff to its damages, Diget and Sanchez's profits, and the costs of the action, including attorney's fees.

## COUNT THREE: TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATIONS
### (*Against Diget and Sanchez*)

122.   Plaintiff restates and incorporates by reference the paragraphs asserted above.

123.    Diget and Sanchez have acted improperly in their dealings with persons whom FAS engages in employment relations.

124.    Among their misconduct, Diget and Sanchez have solicited, recruited, and induced FAS's employees to resign from employment and join Diget and Sanchez's competing venture, all while Diget and Sanchez were employed by FAS, thus interfering with FAS's employment relations with its employees.

125.    FAS has been damaged as a direct and proximate cause of Diget and Sanchez's tortious interference with FAS's employment relations.

126.    FAS has suffered and will continue to suffer irreparable harm from these tortious actions so as to entitle it to preliminary and permanent injunctive relief, and damages in an amount to be proven at trial.

### COUNT FOUR: TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (*Against Diget, Jane/John Does 1-5, Doe Corporations 1-5*)

127.    Plaintiff restates and incorporates by reference the paragraphs asserted above.

128.    Diget, Jane/John Does 1-5, and Doe Corporations 1-5 have acted improperly and without privilege in its dealings with Customer X, whom FAS has a

business relationship and had a valid, enforceable contract to construct non-emergency medical vehicles.

129.   Diget, Jane/John Does 1-5, and Doe Corporations 1-5 encouraged, assisted, and persuaded Customer X to breach its contract with FAS by canceling its order and demanding FAS return its deposit so Customer X could take its business elsewhere.

130.   Diget, Jane/John Does 1-5, and Doe Corporations 1-5 encouraged, assisted, and persuaded Customer X to reduce or limit the number of non-emergency medical vehicles it ordered from FAS.

131.   Diget, Jane/John Does 1-5, and Doe Corporations 1-5 encouraged, assisted, and persuaded Customer X to cancel the order it placed with FAS, and which FAS accepted, and demand its deposit back from FAS.

132.   FAS has been damaged as a direct and proximate cause of Diget, Jane/John Does 1-5, and Doe Corporations 1-5's tortious interference with FAS's contractual and business relationship with Customer X.

133.   FAS has suffered and will continue to suffer irreparable harm from Diget, Jane/John Does 1-5, and Doe Corporations 1-5's tortious actions so as to

entitle it to preliminary and permanent injunctive relief, and damages in an amount to be proven at trial.

134.   In additional misconduct, Diget and Sanchez have solicited, recruited, and induced FAS's employees to resign from employment with FAS and join Diget and Sanchez's competing venture, all while Diget and Sanchez were employed by FAS, thus interfering with FAS's employment relations with its employees.

135.   FAS has been damaged as a direct and proximate cause of Diget and Sanchez's tortious interference with FAS's employment relations.

136.   FAS has suffered and will continue to suffer irreparable harm from these tortious actions so as to entitle it to preliminary and permanent injunctive relief, and damages in an amount to be proven at trial.

### COUNT FIVE: TORTIOUS INTERFERENCE
### WITH PROSPECTIVE ECONOMIC RELATIONS
***(Against Diget, Jane/John Does 1-5, Doe Corporations 1-5)***

137.   Plaintiff restates and incorporates by reference the paragraphs asserted above.

138.   FAS had a prospective business relationship with Customer X for more than the four (4) non-emergency medical vehicles it ultimately provided. FAS was

pursuing Customer X with the expectation of developing an ongoing business relationship with Customer X.

139.   Diget, Jane/John Does 1-5, and Doe Corporations 1-5 knew about FAS's negotiations with Customer X and intentionally interfered with those negotiations by attempting to divert the Customer X business to Diget's new competing venture.

140.   Diget, Jane/John Does 1-5, and Doe Corporations 1-5 encouraged, assisted, and persuaded Customer X to cancel its order with FAS and demand that FAS return Customer X's deposit so Customer X could divert its business to Diget's new competing venture.

141.   Diget acted as a "mediator" between Customer X and FAS with the express purpose of souring the relationship between FAS, Aliyu, and Customer X, and allowing Diget to steal the prospective business for her new competing venture.

142.   Diget even attempted to pay off Aliyu as part of her plan to steal the Customer X business, as she offered to pay Aliyu a set fee for each vehicle Diget constructed for Customer X at her new competing venture.

143.   Diget encouraged, assisted, and persuaded Customer X to reduce or limit the number of non-emergency medical vehicles it had ordered from FAS so she could take the remaining business to her new competing venture.

144.   Diget, Jane/John Does 1-5, and Doe Corporations 1-5 used dishonest, unfair, and improper means by deliberately making false statements to damage the business relationship between FAS and Customer X.

145.   Diget, Jane/John Does 1-5, and Doe Corporations 1-5 acted purposely with malice and the intent to injure FAS.

146.   Diget, Jane/John Does 1-5, and Doe Corporations 1-5's actions induced Customer X not to enter into or continue with a its business relationship with FAS.

147.   FAS has sustained financial injury as a direct and proximate cause of Diget, Jane/John Does 1-5, and Doe Corporations 1-5's tortious interference with FAS's contract and business relationship with Customer X.

148.   FAS has suffered and will continue to suffer irreparable harm from these tortious actions so as to entitle it to preliminary and permanent injunctive relief, and damages in an amount to be proven at trial.

## COUNT SIX: BREACH OF FIDUCIARY DUTIES AND DUTY OF LOYALTY
### (*Against Diget and Sanchez*)

149.   Plaintiff restates and incorporates by reference the paragraphs asserted above.

150.   During her employment, Diget acted as FAS's Vice President. In her capacity of Vice President, Diget owed fiduciary duties and the duty of loyalty to FAS.

151.   Diget breached her fiduciary duties and the duty of loyalty to FAS by failing to act honestly and in good faith with a view to the best interests of FAS. In particular, Diget interfered with FAS's contract and business relationship with Customer X, encouraged Customer X to reduce its business with FAS and to take its business elsewhere, deliberately spread falsehoods about the state of FAS's business, solicited FAS's employees to join a competing venture, deliberately spread falsehoods to FAS employees that they would be losing their jobs, deliberately spread falsehoods to FAS employees that FAS was going out of business, and deliberately spread falsehoods that Aliyu sold FAS to an unknown buyer.

152.  Diget breached her fiduciary duties and the duty of loyalty to FAS by failing to act honestly and in good faith with a view to the best interests of FAS during her employment.

153.  Diget also breached her fiduciary duties and the duty of loyalty to FAS by acting in a way that was contrary to the interests of FAS.

154.  This is not the first time Diget has breached her fiduciary duties, as she deliberately misled Dubbeld and failed to act in Dubbeld's interests as it relates to her operation of Foundation.

155.  Diget has engaged in a pattern or practice of improper and dishonest conduct in her business dealings.

156.  During his employment, Sanchez acted as FAS's Production Manager. In his capacity of Production Manager, Sanchez owed fiduciary duties and the duty of loyalty to FAS.

157.  Sanchez breached his fiduciary duties and the duty of loyalty to FAS by failing to act honestly and in good faith with a view to the best interests of FAS. In particular, Sanchez solicited Ivey to make copies of the cabinet patterns so Sanchez could use this proprietary information at a competing venture. Additionally, Sanchez

actively solicited FAS's employees to join a competing venture by making false threats and promises.

158.    Sanchez breached his fiduciary duties and the duty of loyalty to FAS by failing to act honestly and in good faith with a view to the best interests of FAS during his employment.

159.    Sanchez also breached his fiduciary duties and the duty of loyalty to FAS by acting in a way that was contrary to the interests of FAS.

160.    FAS has been damaged as a direct and proximate cause of Diget and Sanchez's breach of their fiduciary duties and duties of loyalty.

161.    FAS has suffered and will continue to suffer irreparable harm from these tortious actions so as to entitle it to damages in an amount to be proven at trial.

## COUNT SEVEN: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
### (*Against Jane/John Does 1-5 and Doe Corporations 1-5*)

162.    Plaintiff restates and incorporates by reference the paragraphs asserted above.

163.    During her employment, Diget acted as FAS's Vice President. In her capacity of Vice President, Diget owed fiduciary duties to FAS.

164.   Diget breached her fiduciary duties to FAS by failing to act honestly and in good faith with a view to the best interests of FAS. In particular, Diget interfered with FAS's contract and business relationship with Customer X, encouraged Customer X to reduce its business with FAS and take its business elsewhere, deliberately spread falsehoods about the state of FAS's business, solicited FAS's employees to join a competing venture, deliberately spread falsehoods to FAS employees that they would be losing their jobs, deliberately spread falsehoods to FAS employees that FAS was going out of business, and deliberately spread falsehoods that Aliyu sold FAS to an unknown buyer.

165.   During his employment, Sanchez acted as FAS's Production Manager. In his capacity of Production Manager, Sanchez owed fiduciary duties and the duty of loyalty to FAS.

166.   Sanchez breached his fiduciary duties and the duty of loyalty to FAS by failing to act honestly and in good faith with a view to the best interests of FAS. In particular, Sanchez solicited Ivey to make copies of the cabinet patterns so Sanchez could use this proprietary information at a competing venture. Additionally, Sanchez actively solicited FAS's employees to join a competing venture by making false threats and promises.

167.   Jane/John Does 1-5 and Doe Corporations 1-5 had actual knowledge that Diget and Sanchez were in breach of their fiduciary duties by interfering with the contract and relationship with Customer X, attempted theft of FAS's proprietary cabinet patterns, and actively soliciting employees to leave FAS to join its competing venture through improper solicitation, including the spread of falsehoods.

168.   Jane/John Does 1-5 and Doe Corporations 1-5 provided substantial assistance or encouragement towards this breach.

169.   Jane/John Does 1-5 and Doe Corporations 1-5 acted purposefully and with malice and the intent to injure FAS.

170.   Jane/John Does 1-5 and Doe Corporations 1-5's wrongful conduct procured a breach of Diget and Sanchez's fiduciary duties.

171.   FAS has been damaged as a direct and proximate cause of Jane/John Does 1–5 and Doe Corporations 1–5's aiding and abetting Diget and Sanchez to breach their fiduciary duties.

172.   FAS has suffered and will continue to suffer irreparable harm from these tortious actions so as to entitle it to damages in an amount to be proven at trial.

## COUNT EIGHT: CIVIL CONSPIRACY
### (*Against All Defendants*)

173.   Plaintiff restates and incorporates by reference the paragraphs asserted above.

174.   Defendants conspired to commit all of the wrongs described above, including interfering with FAS's contract and business relationship with Customer X, encouraging Customer X to reduce its business with FAS and take its business elsewhere, deliberately spreading falsehoods about the state of FAS's business, soliciting FAS's employees to join a competing venture, deliberately spreading falsehoods to FAS employees that they would be losing their jobs, deliberately spreading falsehoods to FAS employees that FAS was going out of business, and deliberately spreading falsehoods that Aliyu sold FAS to an unknown buyer.

175.   As a result, FAS suffered harm so as to warrant damages in an amount to be proven at trial.

## COUNT NINE: CONVERSION
### (*Against Diget*)

176.   Plaintiff restates and incorporates by reference the paragraphs asserted above.

177.   During Diget's employment, Diget was responsible for updating and maintaining FAS's social media, including its Facebook page.

178.   FAS used its Facebook page to promote its business and engage with current or potential customers.

179.   Since Diget's termination from FAS, she has used FAS's account credentials for FAS's Facebook page to change the account name and rebrand the page with her competing venture, Star Ambulance Georgia. Indeed, Diget prominently posted a new email she created as the contact email for Star Ambulance Georgia on the Facebook page:  dee@starambulancesys.com.

180.   Diget has converted FAS's electronic data, including its Facebook account and social media "followers" on the account.

181.   FAS has demanded that Diget provide the login credentials and access to its social media accounts, including its Facebook page.

182.   Diget has not complied with FAS's demands to provide these login credentials.

183.   FAS demands the return of the login credentials to its social media accounts, including its Facebook page, from Diget.

184.   As a result, FAS suffered harm so as to warrant injunctive relief and damages in an amount to be proven at trial.

## COUNT TEN: PUNITIVE DAMAGES
### (*Against All Defendants*)

185.   Plaintiff restates and incorporates by reference the paragraphs asserted above.

186.   In engaging in the tortious actions described above, Defendants showed willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care, which would raise the presumption of conscious indifference to the consequences, and acted with the specific intent to cause harm.

187.   Diget has demonstrated a pattern of dishonesty, including in her dealings with Dubbeld and the Bank during her operation of Foundation.

188.   Diget has specifically acted with conscious indifference to the consequences of her actions by deliberately spreading falsehoods about the state of FAS's business, threatening FAS's employees, and attempting to scare FAS's employees with falsehoods regarding their job security and livelihoods.

189.   Sanchez has specifically acted with conscious indifference to the consequences of his actions by attempting to induce Ivey to create duplicate cabinet

patterns solely for use by Sanchez at a competing venture. Such action is tantamount to attempted theft of FAS's proprietary cabinet designs.

190.   Additionally, Diget, Jane/John Does 1-5, and Doe Corporations 1-5 have improperly acted with willful misconduct, malice, fraud, wantonness, oppression, an entire want of care, which would raise the presumption of conscious indifference to the consequences, by interfering with FAS's contractual and business relationship with Customer X.

191.   In order to deter Defendants from like behavior in the future, FAS respectfully requests that punitive damages be assessed against them in an amount to be determined at trial.

## COUNT ELEVEN: ATTORNEYS' FEES
### (*Against All Defendants*)

192.   Plaintiff restates and incorporates by reference the paragraphs asserted above.

193.   Defendants have acted in bad faith, caused FAS unnecessary trouble and expense, and have been stubbornly litigious, particularly with respect to their actions in interfering with FAS's contractual and business relationship with Customer X, encouraging Customer X to reduce its business with FAS and take its business elsewhere, deliberately spreading falsehoods about the state of FAS's

41

business, soliciting FAS's employees to join a competing venture, deliberately spreading falsehoods to FAS employees that they would be losing their jobs, deliberately spreading falsehoods to FAS employees that FAS was going out of business, and deliberately spreading falsehoods that Aliyu sold FAS to an unknown buyer.

194.   By reason of the foregoing, FAS is entitled to recover its reasonable attorneys' fees and expenses of litigation from Defendants pursuant to O.C.G.A. § 13-6-11.

## **PRAYER FOR RELIEF**

WHEREFORE, FAS prays for the following relief:

(a)    that FAS be awarded actual and compensatory damages in an amount to be proven at trial;

(b)    that FAS recover all fees and expenses, including reasonable attorneys' fees, as justified;

(c)    that FAS be awarded punitive damages in an amount to be proven at trial;

(d)    that Diget return FAS's social media login credentials;

(e)    that a preliminary injunction be granted;

(f)    that a permanent injunction be issued following a trial on the merits;

(g)     a trial by jury for all the issues so triable; and

(h)     all such other relief as the Court may deem just and proper.

This 6th day of December, 2023.

*/s/ David P. Thatcher*
David P. Thatcher
Georgia Bar No. 703299
Taryn C. Haumann
Georgia Bar No. 957016
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART
One Ninety One Peachtree Tower
191 Peachtree Street, N.E., Suite 4800
Atlanta, Georgia  30303
Telephone: (404) 881-1300
david.thatcher@ogletreedeakins.com
taryn.haumann@ogletreedeakins.com

**Attorneys for Plaintiff**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

FRONTIER AMBULANCE                )
SOLUTIONS, LLC,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )  Civil Action File No. _____
                                   )
DEE BENSON DIGET, ANTONIO          )
SANCHEZ, JANE/JOHN DOES 1-5,       )
and DOE CORPORATIONS 1-5,          )
                                   )
        Defendants.                )

## VERIFICATION

I, Al-Hassan Aliyu, am a member of Frontier Ambulance Solutions, LLC.  I

have read the allegations of the Verified Complaint for Injunctive Relief, Damages,

and Attorneys' Fees, know the contents thereof, and state that the facts alleged in

the Verified Complaint are true to the best of my knowledge.

FRONTIER AMBULANCE
SOLUTIONS, LLC

By: _____

**Al-Hassan Aliyu**
Member, Frontier Ambulance Solutions,
LLC

Sworn to and subscribed before me
this 29 of November , 2023.

Notary Public

My Commission Expires: 8|3|26